UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMEENA HUSSAIN, on behalf of herself<br>others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>MORTGAGEPROS, LLC<br>Defendant. | Case No. 2:26-cv-12618-MAG-APP |

**DEFENDANT MORTGAGEPROS, LLC'S MOTION TO DISMISS**

Defendant MortgagePros, LLC ("MPros" or "Defendant") moves to dismiss the amended putative Class Action Complaint (ECF No. 13; "Complaint") filed by Plaintiff Ameena Hussain ("Plaintiff" or "Hussain") for failure to state a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "**TCPA**"), the regulations found at 47 C.F.R. § 64.1200, and those purporting to arise under Washington State law. For the reasons detailed more fully in Defendant's accompanying brief, the Court should dismiss the Complaint.

The undersigned counsel certifies that Defendant's counsel personally spoke to, or met with, opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief. Plaintiff's counsel expressly denied concurrence.

Dated: September 30, 2026

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

*/s/ Chrisdon F. Rossi*
Chrisdon F. Rossi (License#: P59305)
32605 W. Twelve Mile Road, Suite 300
Farmington Hills, MI 48334
Tel: (248) 783-6780 x4813
Fax: (248) 783 6781
chrisdon.rossi@qpwblaw.com

-and-

Neil E. Asnen (*pro hac vice* application forthcoming)
KLEIN MOYNIHAN TURCO LLP
450 Seventh Avenue – 40th Floor
New York, NY 10123
nasnen@kleinmoynihan.com
*Attorneys for MortgagePros LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| AMEENA HUSSAIN, on behalf of herself<br>others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>MORTGAGEPROS, LLC<br>Defendant. | Case No. 2:26-cv-12618-MAG-APP |

**<u>DEFENDANT MORTGAGEPROS, LLC'S BRIEF IN SUPPORT OF MOTION TO DISMISS</u>**

## STATEMENT OF ISSUES PRESENTED

Hussain brings a putative class action against MPros, seeking monetary, injunctive, and declaratory relief for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), the Washington Automatic Dialing and Announcing Device Act, Wash. Rev. Code § 19.158.010-19.158.901 ("WADAD Act"), the Washington Commercial Electronic Mail Act, Revised Code of Washington ("RCW") § 19.190.060 ("CEMA"), and the Washington Consumer Protection Act, RCW § 19.86.010, et seq. ("CPA"). Plaintiff's claims are subject to dismissal as a matter of law pursuant to Fed. R. Civ. P. 12(b)(6) for the following reasons:

First, while Plaintiff's TCPA claim is brought pursuant to section 227(c)(5) of the TCPA, that provision provides only a limited right of action to a person who "has received more than one **telephone call** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." (emphasis added). The statute unambiguously applies only to telephone calls which were made in violation of regulations prescribed under § 227(c). As a result, all TCPA claims purporting to arise out of Plaintiff's alleged receipt of text messages must be dismissed.

Second, there is no private right of action for violations of 47 C.F.R. § 64.1200(c) because the Federal Communications Commission ("FCC") did not

prescribe this regulation pursuant to any congressional grant of authority under subsection (c) of the TCPA. Rather, it was a congressional directive mandated by the 2003 Do Not Call Implementation Act, 15 U.S.C. § 6151 *et seq*., through which the FCC prescribed the Do Not Call regulations of 47 C.F.R. § 64.1200(c). And because the DNC Act does not afford a private right of action for alleged violations of the regulations prescribed under that statute, Plaintiff's claims for alleged violation of the DNC regulations must be dismissed.

Third, the FCC exceeded the scope of any authority granted to it by the TCPA by redefining the term "residential telephone subscriber" as used in § 227(c) to presumptively include "wireless subscribers." The FCC had no authority to rewrite the statute to broaden § 227(c)(5)'s right of action to cellphone subscribers such as Plaintiff, and her TCPA claims must be dismissed as a result.

Fourth, Plaintiff's state law claims must be dismissed for lack of subject matter jurisdiction. The Complaint explicitly invokes the Court's original jurisdiction over the TCPA claim and is silent as to a jurisdictional predicate over the state law claims. Even had one been invoked, the Court should use its discretion to decline an exercise of supplemental jurisdiction over the claims upon the appropriate dismissal of the TCPA claims.

Fifth, Plaintiff's CEMA claim must be dismissed because a mandatory requirement for an action for money damages under that statute is a claim against an

entity alleged to have violated the statute's anti-phishing provisions. Because Plaintiff has not, and cannot, make such an allegation against MPros, the CEMA claim must be dismissed.

Sixth, Plaintiff's claim for relief under the CPA must be dismissed because while violation of CEMA is a *per se* violation of CPA, the Complaint contains no allegations demonstrating injury to her business or property, a threshold requirement to sustain a claim under the statute.

Seventh, the WADAD Act claim must be dismissed because the right of action under that statute is limited to persons aggrieved by *repeated* violations of the statute. The messages which Plaintiff claims violated the WADAD Act were received within a 4-minute span on a single day. That is not a repeated violation of the statute under any interpretation of the word. She lacks statutory standing under the WADAD Act as a result.

## LEGAL STANDARD

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim should only be considered facially plausible when "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To satisfy the plausibility standard, Plaintiff must set forth "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While a plaintiff is not obligated to plead factual allegations in great detail, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While the Court must accept the allegations in the Complaint as true and construe the complaint in the light most favorable to the plaintiff, this presumption is not applicable to legal conclusions. *Williams v. MemberSelect Ins. Co.*, 2026 U.S. Dist. LEXIS 156957, at * 4 (E.D. Mich. Jul. 15, 2026) (citing *Iqbal*, 556 U.S. at 668). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

# ARGUMENT

## I. 47 U.S.C. § 227(c)(5) DOES NOT PROVIDE A RIGHT OF ACTION FOR RECEIPT OF TEXT MESSAGES

### A. Ordinary Principles of Statutory Interpretation Limit § 227(c)(5)'s Scope to Telephone Calls

47 U.S.C. § 227(c)(5) affords a private right of action to "[a] person who has received more than one **telephone call** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . ." (emphasis added). The plain language of this provision is dispositive that the statute does not apply to text messages. Absent from that language are any of 'text message,' 'message,' or even 'telephone solicitation' (which is statutorily defined to include messages).

Notably, the only Circuit Court to have examined and directly addressed this question comprehensively analyzed the statute and recently concluded that the scope of § 227(c)(5) does not extend to text messages. *See Steidinger v. Blackstone Medical Services*, 182 F.4th 532 (7th Cir. 2026) (affirming dismissal on grounds that the receipt of unsolicited text messages did not give rise to a private right of action under 47 U.S.C. § 227(c)(5)). While not binding on this Court, *Steindinger's* reasoning accords with ordinary statutory interpretation principles and, therefore, offers a highly persuasive analysis.

When interpreting a statute, the "proper starting point lies in a careful

examination of the ordinary meaning and structure of the law itself." *Charlton-Perkins v. Univ. of Cincinnati*, 2026 U.S. App. LEXIS 23495, at *9 (6th Cir. Aug. 5, 2026) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)). The statute must be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). The Supreme Court recently reiterated this principle in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) (*citing Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018)). The first text message was not sent until a year after the TCPA was enacted – therefore, no ordinary person in 1991 would have known what a text message was, let alone understood it to be synonymous with a telephone call. *See Steidinger*, 182 F.4th at 535. And because the TCPA itself does not define the term "telephone call," proper interpretation of § 227(c)(5) requires consideration of the meaning of the term "telephone call" in 1991. *See Delaware v. Pennsylvania*, 598 U.S. 115, 127-28 (2023).

In 1991, a telephone was defined as "[a]n instrument for reproducing sounds at a distance[.]" *Telephone, Webster's Ninth New Collegiate Dictionary* (1991). Meanwhile, call meant "to get or try to get into communication by telephone." *Call, id*. "Thus, in 1991, a 'telephone call' referred to communication via sound." *Steidinger*, 182 F.4th at 536; *see also Stockdale v. Skymount Prop. Grp.*, LLC, 825 F. Supp. 3d 622, 625-26 (N.D. Ohio 2026) (finding that the term telephone call did

not include text messages because text messages do not use a telephone to reproduce sounds at a distance); *Card v. R.J. Reynolds Tobacco Holdings, Inc.*, 2026 U.S. Dist. LEXIS 201636, at *3 (M.D. N.C. Sept. 3, 2026) (citing *Steidinger*, 182 F.4th at 540); *Rush v. Selectquote Ins. Servs*., 2026 U.S. Dist. LEXIS 182934, at *11 (W.D. Mo. Jul. 30, 2026); *Conrad v. Hart Consumer Prods.*, 2026 U.S. Dist. LEXIS 209507 (N.D. Ala. Sept. 16, 2026); *Anthony v. Brian Mktg. Grp.*, 2026 U.S. Dist. LEXIS 210179 (S.D. Fla. Sept. 11, 2026). Text messages, as the name suggests, do not reproduce sound.

One can find further support for the proposition that there is no private right of action under 47 U.S.C. § 227(c)(5) for the receipt of unwanted text messages in the surrounding provision at subsection (c). For example, whereas § 227(c)(1) through (c)(4) consistently use the statutorily defined term "telephone solicitation," § 227(c)(5) explicitly limits the right of action to recipients of of more than one ***"telephone call***." (emphasis added). Courts must presume that Congress intended a different meaning where it used a different term in these subsections of § 227(c). *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022) (explaining the meaningful-variation canon). The only rational conclusion to reach from this difference is that the term telephone call is intentionally narrower than the term telephone solicitation. Both the overall statutory scheme and the ordinary public meaning of telephone call mandate finding that § 227(c)(5)'s private right of action does not extend to text

messages.

It is equally noteworthy that the TCPA has been amended subsequent to its enactment to include explicit uses of the term text message in subsections (e),[1] (i), and (j).[2] 47 U.S.C. § 227(i)(1)(A) reads "a call made ***or*** text message sent . . ." and that 47 U.S.C. § 227(i)(1)(B) similarly reads "a call ***or*** text message . . ."(emphases added). The language of 47 U.S.C. § 227(e)(8)(A) and (B) draws an equally sharp distinction between a call and a text message. Specifically, both § 227(e)(8)(A) and (B) include the same identical phrasing: "a call made using a voice service ***or*** a text message sent using a text messaging service." (emphasis added). Together, the language in these TCPA provisions demonstrate conclusively Congress's understanding that a call and a text message are not one in the same.

Congress has amended the TCPA on multiple occasions to ensure that the scope of various of the statute's restrictions was broad enough to explicitly cover both telephone calls and text messages. But it has notably not done so with respect to § 227(c)(5). "Adjacent provisions utilizing different terms . . . must connote different meanings." *Jewish Hosp. v. Secretary of Health & Human Servs.,* 19 F.3d 270, 275 (6th Cir. 1994). In the TCPA, one provision of the statute uses the term(s)

---

[1] The TCPA was amended in 2018 to include subsection (e)'s text message language. *See* Pub. L. 115-141.

[2] The TCPA was amended in 2019 to include the text message language in sections (i) and (j). *See* Pub. L. 116-105.

"call or text message") while another merely uses the term "telephone call." The only permissible conclusion to reach from this difference is that the latter term is intentionally narrower than the former. Simply stated, telephone call as used in § 227(c)(5) does not include text messages.

### B. The FCC's Interpretation of the TCPA Is Not Binding On this Court

In *Loper Bright*, through which the Supreme Court overturned the *Chevon* deference doctrine, the Court reiterated that it is the traditional function of courts to decide whether the law means what the agency says." *Loper Bright*, 603 U.S. 369, 392 (2024). Thus, notwithstanding the FCC's proclamation in its 2003 rulemaking that the term "call" for TCPA purposes "encompasses both voice calls and text calls," 18 FCC Rcd. 14014 ¶ 165 (2003) (the "2003 Order"), the Court need not defer to the interpretation. [3]

In the 2003 Order, the FCC did not cite to any statutory support for its conclusion that the term "call" encompasses a text message. Of course, the reason for that silence is readily apparent – no statutory basis exists for that conclusion. The

[3] To the extent that the Hobbs Act might have otherwise compelled the Court to defer to the FCC's interpretation even after *Loper Bright*, that shackle has been unbound as well. In *McLaughlin Chiropractic Assocs. V. McKesson Corp*., 606 U.S. 146, 168 (2025), the Supreme Court held that in enforcement proceedings, district courts are not "bound by the FCC's interpretation of the TCPA," and that instead it "should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."

FCC instead proclaimed that the interpretation was consistent with its understanding of the TCPA's policy goals. 18 FCC Rcd. 14014 ¶ 165.

It is the Court that has the appropriate authority to interpret the TCPA's text, not the FCC. This has been reaffirmed by the Supreme Court in both *Loper Bright* and *McLaughlin Chiropractic*. While *McLaughlin Chiropractic* calls for "appropriate respect" to be afforded to the FCC's interpretation, the Court "can provide appropriate respect to [the] agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text." *Davis v. CVS Pharm, Inc.*, 797 F. Supp. 3d 1270, 1275 (N.D. Fla. 2025).

The FCC's policy-based interpretation cannot rewrite the TCPA's clear text. In fact, because this policy-based interpretation conflicts with the text, the Court should disregard it, exercise its own independent judgment, and appropriately conclude that the unambiguous terms of § 227(c)(5) do not apply to text messages.

### C. 47 C.F.R. § 64.1200(e) Does Not Render 47 U.S.C.§ 227(c)(5) Applicable to Text Messages

47 C.F.R. § 64.1200(e) provides that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing or text message calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. '*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*.'" For three distinct reasons, however,

this provision does not alter the fact that 47 U.S.C. § 227(c)(5) does not apply to text messages.

First, the provision itself contains language limiting its scope: "to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" The 2003 Order which purported to bring text messages within the definition of "call" did so within the context of § 227(b), not § 227(c). Underscoring this point are that the FCC (1) explicitly mentioned "automatic telephone dialing system," "artificial or prerecorded message," and "automated or prerecorded telephone calls," and (2) cited only to 47 U.S.C. § 227(b) and the implementing regulation of that provision, 47 C.F.R. 64.1200(a). *See, e.g.*, *Jones v. Blackstone Med. Servs.*, LLC, 792 F. Supp. 3d 894, 900-01 (C.D. Ill. July 21, 2025), *aff'd*, *Steidinger*, 182 F.4th 532 (7th Cir. 2026). And so, by the FCC's own limitation, the provision does not serve as a mechanism to broaden the scope of 47 U.S.C. § 227(c)(5)'s coverage to text messages.

Second, and as explained in further detail below, Congress imposed a deadline by which the FCC was to prescribe rules purporting to "implement methods and procedures for protecting the privacy rights" of residential telephone subscribers. That deadline, set by 47 U.S.C. § 227(c)(2), was not later than September 21, 1992, a date that had long since passed by the time that the FCC had both amended 47

C.F.R.§ 64.1200 to include subsection (e), 68 FR 44144 (2003), and then later revised the subsection to include the words "text message," 89 FR 5098 (2024). Consequently, the Court must refuse to apply it in a manner that rewrites the text of 47 U.S.C. § 227(c)(5), as the rule is otherwise void and unenforceable by virtue of the FCC's lack of statutory authority to prescribe it. [4]

Third, the FCC, like every other executive agency, has no authority to rewrite the terms of legislation. "Atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 315 (11th Cir. 2025) (citing *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014)) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."); *UMG Recordings v. Grande Comm. Networks*, 118 F.4th 697, 723 (5th Cir. 2024) ("between policy arguments and the statutory text . . . the text [of the Act] must prevail."); *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (observing that an agency's opinion that its rule is "good policy" "does not change the statute's text")).

The statutory text of 47 U.S.C. § 227(c)(5) is clear that the private right of action is conferred to recipients of one or more telephone call, not to recipients of text messages. *Steidinger*, 182 F.4th at 540. The FCC has no authority to dictate

---

[4] As MPros explains in detail further hereinbelow, the expiration of this statutory deadline served to terminate all rulemaking authority conferred on the FCC to prescribe regulations under § 227(c).

otherwise. *Ins. Mkt. Coal. Ltd.*, 127 F.4th at 315. Consistent with this Court's traditional function "to decide whether the law means what the agency says," it should reject any entreaty to enforce 47 C.F.R. § 64.1200(e) so as to rewrite the TCPA's clear statutory text. *Loper Bright*, 603 U.S. at 392 (2024).

## II. THERE IS NO PRIVATE RIGHT OF ACTION FOR ALLEGED VIOLATIONS OF 47 C.F.R. § 64.1200(c)

Whereas 47 U.S.C. § 227(b): (i) broadly applies to any call placed with either automated or prerecorded or artificial message technology; (ii) provides a private of action to any recipient of such a call placed without his/her prior express consent, and (iii) confers perpetual rulemaking authority upon the FCC to prescribe regulations to implement the subsection, 47 U.S.C. § 227(c)'s scope is far more limited and thus stands in stark contrast to § 227(b).

47 U.S.C. § 227(c) is unique and the limitations of that section manifest in a number of ways. Among them are that it clearly and unambiguously (i) applies only to one particular kind of call (telephone solicitations) rather than to any call; (ii) provides a private right of action only to those recipients of two or more telephone calls placed in violation of regulations prescribed pursuant to the subsection; and (iii) and confers rulemaking authority upon the FCC that (a) expressly imposes a deadline by which such regulations must be prescribed and (b) explicitly includes minimum substantive requirements mandated of certain such regulations prescribed pursuant to that grant of authority, including regulations concerning establishment

and operation of a national database of telephone numbers of residential subscribers who object to receiving telephone solicitations.

The difference in breadth and scope between § 227(b) and § 227(c) is unsurprising. When Congress enacted the TCPA, it considered automated telephone calls to be a far greater concern than live solicitations. *Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638, at *11 (D. Or. July 21, 2025) ("Congress found that automated prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls") (internal citation omitted). That difference in concern is reflected by the limiting language throughout § 227(c). In turn, that limiting language reveals that the TCPA does not provide a private right of action for alleged violations of 47 C.F.R. § 64.1200(c)(2). In recognition of this, the Middle District of Florida recently granted dismissal finding that there is no private right of action under 47 U.S.C. § 227(c)(5) for purported violations of 47 C.F.R. § 64.1200(c). *See Internicola v. MortgagePros, LLC*, 2026 U.S. Dist. LEXIS 218718, at *9-10 (M.D. Fla. Sept. 24, 2026). For the reasoning laid out in *Internicola*, as more fully set forth as follows, this Court should do the same here.

### A. § 227(c) Expressly Limits the Scope of the FCC's Rulemaking Authority

In two separate provisions, Congress unequivocally limited the FCC's rulemaking authority under 47 U.S.C. § 227(c) in a manner that imposed a deadline by which the FCC was to prescribe regulations pursuant to § 227(c).

First, 47 U.S.C. § 227(c)(1) provides that "[w]ithin 120 days after enactment of this section [enacted Dec. 20, 1991], the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."

Second, 47 U.S.C. § 227(c)(2) then goes on to provide that "[n]ot later than 9 months after the date of enactment of this section [enacted Dec. 20, 1991], the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph . . . ."

Through these two sections, Congress imposed two deadlines upon the FCC: first, a rulemaking proceeding was to be initiated no later than April 18, 1992; and second, that rulemaking proceeding was to be concluded and regulations to implement methods and procedures for protecting the privacy rights described in 47 U.S.C. § 227(c)(1) were to be prescribed no later than September 20, 1992.

Subsequent to the TCPA's enactment, the FCC understood its assignment. Accordingly, on April 17, 1992, the FCC initiated a Notice of Proposed Rulemaking in which it proposed and sought comment on certain TCPA-related regulations. 7 FCC Rcd 2736 (1992). Thereafter, on September 17, 1992, the FCC adopted the initial rules to implement the TCPA, which were subsequently released on October 16, 1992 and published in the federal register thereafter on October 23, 1992. *See*

FCC 92-443 and CC Docket No. 92-90. These rules comprise the universe of rules permissibly prescribed within the statutory authority conferred on the FCC. Any other rules purporting to implement § 227(c) but which were (i) prescribed pursuant to a rulemaking proceeding which was initiated later than April 18, 1992 and/or (ii) promulgated later than September 20, 1992, were enacted by the FCC in excess of authority granted to it by § 227(c). *See Internicola*, 2026 U.S. Dist. LEXIS 218718, at *9.

The TCPA's other operative subsections demonstrate that Congress deliberately imposed the deadline set by § 227(c). Contrast the time limitations included in §§ 227(c)(1) and (2) with the broad perpetual grant of rulemaking authority of § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."), § 227(d)(2) ("The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require . . ."), § 227(d)(3) ("The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone."), and § 227(e)(3) ("The Commission shall prescribe regulations to implement this subsection.").

The time-limited rulemaking authority of § 227(c) shares a much closer resemblance to the rulemaking authority conferred by § 227(i)(1) and § 227(j)(1), both of which also contain specific deadlines by which Congress mandated any rules

pursuant to those grants of authority were to be prescribed. *See* § 227(i)(1) ("Not later than 18 months after the date of the enactment of this subsection [enacted Dec. 30, 2019], the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to . . .") *and* § 227(j)(1) ("Not later than 1 year after the date of the enactment of this subsection [enacted Dec. 30, 2019], shall take a final agency action to ensure the robocall blocking services provided on an opt-out or opt-in basis pursuant to the Declaratory Ruling of the Commission in the matter of Advanced Methods to Target and Eliminate Unlawful Robocalls (CG Docket No. 17-59; FCC 19-51; (adopted on June 6, 2019)).

**B. The FCC's NDNC-related regulations were prescribed pursuant to 15 U.S.C. § 6153**

In the FCC's 1992 Report and Order, the Commission adopted regulations implementing the TCPA and permitting consumers to avoid unwanted telephone solicitations through company-specific do-not-call lists. FCC 92-443.

While § 227(c)(3) gave the FCC discretion to establish an NDNC, the FCC expressly declined to establish a national do-not-call ("NDNC") list, concluding that a national database would be costly and difficult to maintain accurately, require frequent updates, impose costs on telemarketers and consumers, and raise privacy concerns. 67 FR 62667, *62676 ¶ 41 (1992). As a result, Congress subsequently took separate steps that resulted in the NDNC and supplied the FCC with

independent authority to regulate it.

First, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 et seq. (the "Telemarketing Act"), directing the FTC to prohibit deceptive and abusive telemarketing practices. 15 U.S.C. § 6102(a). The resulting Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.1 et seq., initially included only a company-specific do-not-call requirement. But as a result of conducting a congressionally-mandated review of the TSR, the FTC proposed creating a national do-not-call registry, which the FTC subsequently established in January 2003. 68 FR 4580 (2003).

Unlike the FCC's time-limited authority under 47 U.S.C. § 227(c), the Telemarketing Act gave the FTC continuing rulemaking authority. 15 U.S.C. § 6102(a)(1). Nevertheless, uncertainty regarding the FTC's authority to create the NDNC arose (*see U.S. Sec. v. F.T.C.*, 282 F.Supp.2d 1285, 1291 (W.D. Okla. 2003), so Congress then enacted the Do Not Call Implementation Act ("DNC Act"), 15 U.S.C. § 6151 et seq., to resolve that uncertainty. Section 6151(a) expressly states that the FTC has the authority to implement and enforce a national do-not-call registry pursuant to the Telemarketing Act; while 15 U.S.C. § 6151(b) states that the provision of the TSR which had been amended to establish the NDNC (16 C.F.R. § 310.4(b)(1)(iii)) was formally ratified.

Because the FTC's jurisdiction did not cover certain entities and calls—

including common carriers, insurance companies, banks, credit unions, political solicitations, and certain intrastate calls—the DNC Act separately required the FCC to issue NDNC regulations so that if one of those entities not covered by the TSR's NDNC rule were to make an offending call, a prospective violation would not otherwise fall through the cracks. 15 U.S.C. § 6153. Unlike § 227(c), which had provided discretionary authority, § 6153 mandated that the FCC issue a final rule.

In order to ensure that the FCC could meet § 6153's deadline to prescribe the mandated rules, Congress identified an ongoing rulemaking proceeding that the FCC had initiated prior to the DNC Act's enactment, and directed that it be the vehicle through which the FCC prescribed the regulations. Similarly, Congress recognized both that the deadline by which the FCC could prescribe NDNC-related regulations in compliance with §227(c)(3) and (4) had lapsed, and that with the lapse the FCC's statutory authority to promulgate rules effectuating the goals of those provisions had expired. Therefore, in the DNC Act, Congress provided solutions to the NDNC-related cost considerations that the FCC had previously been tasked with in §§ 227(c)(3) and (4) but had exercised discretion not to regulate within the enumerated timeline, including the setting of a fee schedule. *See* 15 U.S.C. § 6154.

Finally, in notable contrast with § 6151 which explicitly cited the independent statutory authority pursuant to which the FTC's NDNC-related rulemaking arose, § 6153 does not identify § 227(c) as the source of the FCC's NDNC rulemaking

authority. Instead, it directed the FCC to use an existing rulemaking proceeding to issue the mandated regulations. Thus, upon examination, it is apparent that the FCC prescribed the NDNC-related regulations contained in 47 C.F.R. § 64.1200 not pursuant to any rulemaking authority conferred by 47 U.S.C. § 227(c), but rather, pursuant to the rulemaking authority conferred on it by 15 U.S.C. § 6153.

The DNC Act, however, does not create an independent private right of action. It ratifies the FTC's NDNC, establishes its funding mechanism and fee schedule, imposes reporting requirements, and directs the FCC to adopt regulations consistent with the FTC's rules.

Accordingly, there is no private right of action for an alleged violation of 47 C.F.R. § 64.1200(c). Plaintiff's claims based solely on an alleged violation of that regulation should therefore be dismissed.

## III. § 227(c) DOES NOT APPLY TO WIRELESS SUBSCRIBERS

Through Section 227(c), Congress conferred on the FCC rulemaking authority for purposes of protecting the privacy rights of "residential telephone subscribers." By extending the protections afforded by the regulations purportedly prescribed pursuant § 227(c) to wireless subscribers, the FCC exceeded the scope of its authority and rewrote the statute's language in the process.[5]

---

[5] While Plaintiff does not explicitly allege that her telephone number is a wireless telephone number, she alleges the receipt of text messages and asserts a claim under CEMA's text message provision. Therefore, a plausible inference to reach is

In the 2003 Order, the FCC redefined the term "residential telephone subscriber" to presumptively include "wireless subscribers." 18 FCC Rcd. 14014, at 14039 ("[W]e will presume wireless subscribers who ask to be put on the national d-not-call list to be residential subscribers.").[6] However, in doing so, the FCC articulated a flawed rationale purportedly supporting its authority to rewrite the statute. Specifically, it stated that "a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations." *Id.* at 14034. Nevertheless, the congressional rulemaking authority conferred on it through § 227(c) not only is limited to the implementation of methods and procedures (of which a redefinition of reclassification of residential telephone subscriber is neither) it speaks nothing of residential consumers; it speaks of residential subscribers.

The term "residential telephone subscriber" by its plain meaning, however, does not apply to cellular subscribers. Because the TCPA does not define "residential telephone subscriber," the statutory interpretation analysis is the same

---

that Plaintiff's telephone number is wireless.

[6] MPros expressly incorporates by reference the arguments set forth in Section II, A, *supra*, as set forth herein. The deadline imposed by Congress in § 227(c)(1)-(2) applies with equal force to any regulation, purportedly prescribed by the FCC under § 227(c), which was promulgated after that deadline had lapsed, inclusive of the provisions of the 2003 which redefined "residential telephone subscriber" to include "wireless subscribers."

as that which applied to "telephone call" – meaning that the term must be given its ordinary meaning at the time the text was adopted. "[I]n 1991, dictionaries defined "residential" as 1) "of or connected with residence," 2) "of, characterized by, or suitable for, residences or homes," and 3) "chiefly for residents rather than transients." And "residence" was defined as a "dwelling, place, or adobe, especially a 'house.' Important too, a mainstream definition of "subscriber" at the time of enactment was "an individual having commercial telephone equipment installed on his premises." *Anthony v. Brian Mktg. Grp.*, 2026 U.S. Dist. LEXIS 21079, at *16-17 (M.D. Fla. Sept. 11, 2026) (internal Webster and Black's Law Dictionary citations omitted).

The TCPA itself also distinguishes between "cellular" and "residential." By way of example, § 227(b)(1)(A)(ii) prohibits use of autodialers to make calls to a cellular telephone service, while § 227(b)(1)(A)(iii) and § 227(b)(1)(B) prohibit using that technology to initiate calls to residential telephone lines. *See also, Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 613 (describing § 227(b) as "prohibit[ing] robocalls to cell phones and home phones"); *Turizo v. Subway Franchisee Adver. Fund. Tr. Ltd.*, 603 F.Supp. 3d 1334, 1334 (S.D. Fla. 2022) (comparing provisions of § 227(b) and concluding that "[t]he TCPA clearly draws a distinction between cellular telephones and residential telephones."). The conclusion to draw from the TCPA's multiple examples of distinction in the other

primary governing section is that there would be no need to make the distinction if Congress believed they were one in the same. In fact, the provisions would be rendered surplusage if that were the case. Where Congress knew how to draw the distinction between residential and cellular in one portion of the statute, its decision not to in another portion of the statute must be given meaning. And the FCC's action to disregard that decision was an improper exercise of authority.

While the FCC may have believed that it was good policy to allow wireless subscribers to be deemed "residential telephone subscribers" for purposes of § 227(c), "[a]textual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 315. It had no authority to rewrite the TCPA. Because Plaintiff is a wireless telephone subscriber and not a residential telephone subscriber, she lacks the statutory standing to assert claims under § 227(c) for the telephone calls and/or text messages at issue.

## III. PLAINTIFF'S WASHINGTON STATE LAW CLAIMS MUST BE DISMISSED

Plaintiff's two Washington State law claims must be dismissed for at least four discrete reasons. First, the Complaint does not set forth a jurisdictional basis for this Court to adjudicate those. And even if it did, the Court should decline to exercise supplemental jurisdiction over the claims following the appropriate dismissal of the TCPA claims. Second, the Complaint lacks sufficient allegations to sustain an action for money damages Washington's Commercial Electronic Mail Act, RCW

19.190.010, et seq. ("CEMA") private right of action requires that a suit seeking such relief be brought against an entity which allegedly violated CEMA's anti-phishing provisions. Third, the Complaint lacks sufficient allegations to plausibly plead a claim under Washington's Consumer Protection Act, RCW 19.86.010, et seq. And lastly, Plaintiff's claim under the Washington Automatic Dialing and Announcing Act ("WADAD") fails because Plaintiff was not aggrieved by repeated violations of the Act despite the right of action being limited to persons aggrieved only by repeated violations.

### A. <u>The Court Lacks Subject Matter Jurisdiction Over the State Law Claims</u>

The Complaint's lone jurisdictional allegation is found at paragraph 7. It states that "[t]his Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the TCPA, 47 U.S.C. § 227. While this may be true, it is insufficient as a basis to invoke the Court's subject matter jurisdiction over the two state law claims. For that reason alone, the state law claims must be dismissed.

Moreover, upon the appropriate dismissal of the TCPA claims, there would be no adequate jurisdictional predicate over the state law claims at all. The Complaint contains no allegations that support an exercise of diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), and any effort to invoke 28 U.S.C. § 1367 should be met with a refusal to exercise supplemental jurisdiction in accordance with 28

U.S.C. § 1367(c)(3).

### B. Plaintiff Does Not Have a Private Right of Action for Damages Under CEMA

Washington's Commercial Electronic Mail Act, codified at RCW 19.190.005 *et seq.* enumerates the private right of action at RCW 19.190.090(1). In relevant part it provides that, "[a] person who seeks damages under this subsection may only bring an action against a person or entity that directly violates RCW 19.190.080."

The Washington Supreme Court has unambiguously defined the scope of the CEMA right of action. It conclusively held that one who receives a text message that violates CEMA, but that does not involve phishing, has no private right of action. *See Wright v. Lyft, Inc.*, 189 Wn.2d 718, 723 (2017) ("We conclude that the plain language of chapter 19.190 RCW creates a private cause of action with damages only for phishing violations. RCW 19.190.080, 090."). As a result, aside from phishing violations, CEMA does not imply a cause of action for monetary damages. *See Wright*, 189 Wn.2d at 728 (finding that the recipient of a text message in violation of CEMA did not have a private right of action for monetary damages).

"Phishing" generally refers to Internet activity using fraudulent e-mails and websites to induce someone to reveal personally identifying information under false pretenses. *Id.* at 725. However, Plaintiff not only does not plead facts to support a phishing violation, but the images of the subject text messages demonstrate that they were not phishing. Thus, because the private right of action for damages is limited

to "phishing" violations, Plaintiff's CEMA claim must be dismissed.

**C. Plaintiff Fails to Plead A CPA Claim**

Similarly, Plaintiff fails to set forth allegations sufficient to support a Washington Consumer Protection Act ("CPA") claim.

To establish a CPA claim, a plaintiff must establish: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business or property, and (5) causation. *See Wright*, 189 Wn.2d at 728 (citing H*angman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)). And while a CEMA violation is a *per se* CPA violation, it does not necessarily follow that a CEMA violation entitles a plaintiff to recover under the CPA. This is because "[a] successful CEMA claim establishes only the first three elements" of a CPA claim. *Meade v. Profusion Cosmetics Corp.*, 2026 U.S. Dist. LEXIS 163413, at *5 (D. Wash. July 16, 2026). "CPA still requires the plaintiff to show the defendant caused injury to their business or property. [A] CPA claim, dependent entirely on CEMA, is not cognizable" *Id.*

Plaintiff's Complaint is bereft of any allegation concerning a purported injury to her business or property. For that reason alone, the CPA claim must be dismissed.

**D. Plaintiff Lacks Statutory Standing to Bring a WADAD Act Claim**

The private right of action for an alleged violation of the WADAD Act is found at RCW § 80.36.390(13) and provides that "[a] person aggrieved by repeated

violations of this section may bring a civil action in superior court to enjoin future violations, to recover damages, or both." Plaintiff fails to satisfy the threshold requirement for statutory standing of having been aggrieved by repeated violations.

Specifically, Plaintiff claims that the WADAD Act was violated through text messages received during hours deemed impermissible by § 80.36.390(8). The Complaint identifies these messages at paragraph 38 through a screenshot. However, several things are demonstrated by that screenshot, and the timestamps included therein, which underscore both that the statute was not repeatedly violated, and that Plaintiff was not aggrieved by any alleged violation.

First, the final of the three messages in the screenshot is a downloadable file accompanying the message above it, as reflected by their identical timestamps. Even were that not the case, and it was its own separate message, it is not a telephone solicitation as that term is defined by § 80.36.390(1) given that nothing in that image is intended to encourage the purchase of property, goods, or services. Thus, at issue is the alleged receipt of two messages purportedly in the quiet hours window. However, § 80.36.390(13) requires *repeated violations*. Had the Legislature intended for two or more to satisfy this threshold, it could have said so. It instead used "repeated," connoting not only recurrence but a recurrence which itself has recurred.

Second, even if "repeated" could be satisfied by a low count such as two,

repetition implies recurrence over time and the timestamp of the messages further demonstrates that the messages were received within a 4-minute window of the same day. Most generously, this represents a single continuous event, not repeated violations that occurred over an extended period of weeks, days, or even hours.

Underscoring that this was a single incident rather than an example of repeated violations, the timestamp of the messages also demonstrates that Plaintiff did not respond to the messages until approximately 56 hours had passed following their receipt. Not only might one reasonably expect that repeated intrusions would elicit a more immediate response, but surely no reasonable person legitimately aggrieved by a statutory violation which is alleged to have annoyed or harassed her, and who would respond to the messages – as Plaintiff did – would wait more than two days to do so.

By virtue of the foregoing, Plaintiff has failed to satisfy the requirements for statutory standing for a WADAD Act claim. It must be dismissed as a result.

## IV. CONCLUSION

For the foregoing reasons, MPros respectfully requests that the Court grant this motion, dismiss the Complaint, and grant MPros such further and additional relief as the Court deems just and proper.

Dated: September 30, 2026

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

*/s/ Chrisdon F. Rossi*
Chrisdon F. Rossi (License#: P59305)
32605 W. Twelve Mile Road, Suite 300
Farmington Hills, MI 48334
Tel: (248) 783-6780 x4813
Fax: (248) 783 6781
chrisdon.rossi@qpwblaw.com

-and-

Neil E. Asnen (*pro hac vice* application forthcoming)
KLEIN MOYNIHAN TURCO LLP
450 Seventh Avenue – 40th Floor
New York, NY 10123
nasnen@kleinmoynihan.com
*Attorneys for MortgagePros LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 30, 2026, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/ *Chrisdon F. Rossi*
Chrisdon F. Rossi