**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

AMEENA HUSSAIN,
on behalf of herself and
others similarly situated,

Plaintiff,

vs.

MORTGAGEPROS, LLC

Defendant.

Case No. 2:26-cv-12618-MAG-APP

**DEFENDANT MORTGAGEPROS, LLC'S MOTION TO DISMISS**

Defendant MortgagePros, LLC ("**MPros**" or "**Defendant**") moves to dismiss the First Amended putative Class Action Complaint (ECF No. 9; "**FAC**"), filed by Plaintiff Ameena Hussain ("**Plaintiff**" or "**Hussain**"), for failure to state a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "**TCPA**"), the regulations found at 47 C.F.R. § 64.1200, and those purporting to arise under Washington State law. For the reasons detailed more fully in Defendant's accompanying brief, the Court should dismiss the FAC.

Pursuant to E.D. Mich. LR 7.1(a), counsel for Defendant contacted counsel for Plaintiff by email on October 20, 2026 to explain the nature of this motion and its legal basis, and to seek concurrence in the relief. Plaintiff's counsel indicated opposition to the relief sought.

Dated: October 21, 2026

**KLEIN MOYNIHAN TURCO LLP**

By: */s/Neil E. Asnen*
Neil E. Asnen
450 Seventh Avenue – 40th Floor
New York, NY 10123
212.246.0900
nasnen@kleinmoynihan.com

-and-

Chrisdon F. Rossi (License #: P59305)

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
32605 W. Twelve Mile Road, Suite 300
Farmington Hills, MI 48334
Tel: (248) 783-6780 x4813
Fax: (248) 783 6781
chrisdon.rossi@qpwblaw.com

*Attorneys for MortgagePros LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| AMEENA HUSSAIN,<br>on behalf of herself and<br>others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MORTGAGEPROS, LLC<br><br>Defendant. | Case No. 2:26-cv-12618-MAG-APP |

**DEFENDANT MORTGAGEPROS, LLC'S**
**BRIEF IN SUPPORT OF MOTION TO DISMISS**

**STATEMENT OF ISSUES PRESENTED**

MPros moves to dismiss Plaintiff's claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), RCW §80.36.390, and the Washington Consumer Protection Act, RCW § 19.86.010, et seq. ("CPA"), predicated on the Washington Commercial Electronic Mail Act, RCW § 19.190.060 ("CEMA"). The issues presented are:

1. Whether 47 U.S.C. § 227(c)(5), which provides a right of action only to a person who "has received more than one telephone call," provides a right of action for the receipt of text messages.

2. Whether there is a private right of action for alleged violations of 47 C.F.R. § 64.1200(c), where the Federal Communications Commission ("FCC") prescribed that regulation under the Do Not Call Implementation Act, 15 U.S.C. § 6151 *et seq.*, which provides no private right of action.

3. Whether the FCC exceeded its authority under 47 U.S.C. § 227(c) by decreeing wireless telephone subscribers to be "residential telephone subscribers."

4. Whether, if the TCPA claims are dismissed, the Court should

decline to exercise supplemental jurisdiction over the state law claims.

5. Whether Count IV, a CPA claim predicated on an alleged CEMA violation, must be dismissed, because CEMA provides no damages action absent phishing and the FAC alleges no economic injury to Plaintiff's business or property.

6. Whether Plaintiff, who pleads no facts tying seven voice calls to MPros and alleges text messages received within four minutes on a single day, was "aggrieved by repeated violations" of RCW § 80.36.390.

**CONTROLLING OR MOST APPROPRIATE AUTHORITY**

**ISSUE 1:**
47 U.S.C. § 227 *et seq.*
*Loper Bright*,
603 U.S. 369 (2024)
*McLaughlin Chiropractic Assocs. V. McKesson Corp.*,
606 U.S. 146, 168 (2025)
*Steidinger v. Blackstone Medical Services*,
182 F.4th 532 (7th Cir. 2026)

**ISSUE 2:**
47 U.S.C. § 227 *et seq.*
15 U.S.C. § 6153
*Internicola v. MortgagePros, LLC*,
2026 WL 3027393 (M.D. Fla. Sept. 24, 2026)

**ISSUE 3:**
47 U.S.C. § 227 *et seq.*
*Ins. Mktg. Coal. Ltd. v. FCC*,
127 F.4th 303 (11th Cir. 2025)
*Anthony v. Brian Mktg. Grp.*,
2026 WL 2685650 (S.D. Fla. Sept. 11, 2026)
*Lowrey v. Twilio, Inc.*, 2026 WL 2958730
(W.D.Va. Oct. 1, 2026)
*Koeller v. OX Appsec Sec., Inc.*, 2026 WL 2935851
(E.D.MO. Sept. 30, 2026)

**ISSUE 4:**
28 U.S.C. § 1367
*Musson Theatrical, Inc. v. Fed. Express Corp.*,
89 F.3d 1244 (6th Cir. 1996)

**ISSUE 5:**
RCW § 19.86.090; RCW §§ 19.190.040(1), .060(2), .090(1)

*Wright v. Lyft, Inc.*,
189 Wn.2d 718 (2017)
*Montes v. SPARC Grp. LLC,*
6 Wn.3d 321 (2026)
H*angman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
105 Wn.2d 778, 780 (1986)

**<u>ISSUE 6</u>:**
RCW §§ 80.36.390(1)(a), (13)
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)

## LEGAL STANDARD

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). To satisfy the plausibility standard, Plaintiff must set forth "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While a plaintiff is not obligated to plead factual allegations in great detail, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim should only be considered facially plausible when "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662.

## ARGUMENT

### I. 47 U.S.C. § 227(c)(5) DOES NOT PROVIDE A RIGHT OF ACTION FOR RECEIPT OF TEXT MESSAGES

#### A. <u>Ordinary Principles of Statutory Interpretation Limit § 227(c)(5)'s Scope to Telephone Calls</u>

47 U.S.C. § 227(c)(5) affords a private right of action to "[a] person who has received more than one **telephone call** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . ." (emphasis added).

The plain language of this provision is dispositive that the statute does not apply to text messages. Absent from that language are the terms 'text message,' and even 'telephone solicitation' (which is statutorily defined to include messages). Moreover, the only Circuit Court to address the question has held that § 227(c)(5) does not extend to text messages. *See Steidinger v. Blackstone Medical Services*, 182 F.4th 532 (7th Cir. 2026).

When interpreting a statute, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Charlton-Perkins v. Univ. of Cincinnati*, 2026 WL 2254577, at *9 (6th Cir. Aug. 5, 2026) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)). The statute must be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). The first text message was not sent until a year after the TCPA was enacted – therefore, no ordinary person in 1991 would have known what a text message was, let alone understood it to be synonymous with a telephone call. *See Steidinger*, 182 F.4th at 535. And because the TCPA itself does not define the term "telephone call," proper interpretation of § 227(c)(5) requires consideration of the meaning of the term "telephone call" in 1991. *See Delaware v. Pennsylvania*, 598 U.S. 115, 127-28 (2023).

In 1991, a telephone was defined as "[a]n instrument for reproducing sounds at a distance[.]" *Telephone, Webster's Ninth New Collegiate Dictionary* (1991). Meanwhile, call meant "to get or try to get into communication by telephone." *Call, id*. "Thus, in 1991, a 'telephone call' referred to communication via sound." *Steidinger*, 182 F.4th at 536; *see also Stockdale v. Skymount Prop. Grp.*, LLC,

825 F. Supp. 3d 622, 625-26 (N.D. Ohio 2026) (finding that the term telephone call did not include text messages because text messages do not use a telephone to reproduce sounds at a distance); *Card v. R.J. Reynolds Tobacco Holdings, Inc.*, 2026 WL 2673068, at *3 (M.D. N.C. Sept. 3, 2026) (citing *Steidinger*, 182 F.4th at 540); *Rush v. Selectquote Ins. Servs.*, 2026 WL 2495598, at *11 (W.D. Mo. Jul. 30, 2026); *Conrad v. Hart Consumer Prods.*, 2026 WL 2741623 (N.D. Ala. Sept. 16, 2026); *Anthony v. Brian Mktg. Grp.*, 2026 WL 2685650 (S.D. Fla. Sept. 11, 2026). As the name suggests, text messages do not reproduce sound.

The surrounding subsections of § 227(c) provide further support to the proposition that there is no private right of action under 47 U.S.C. § 227(c)(5) for the receipt of unwanted text messages. For example, whereas § 227(c)(1) through (c)(4) consistently use the statutorily defined term "telephone solicitation," § 227(c)(5) explicitly limits the right of action to recipients of more than one ***"telephone call."*** (emphasis added). Courts must presume that Congress intended a different meaning where it used a different term in these subsections of § 227(c). *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022) (explaining the meaningful-variation canon). That difference leads to a single rational conclusion - the term telephone call is intentionally narrower than the term telephone solicitation. Thus, both the overall statutory scheme and the ordinary public meaning of telephone call mandate finding that § 227(c)(5)'s right of action does not encompass text messages.

Congress has amended the TCPA to refer expressly to text

messages in subsections (e),[1] (i), and (j).[2] Each time, it distinguished text messages from calls. *See* 47 U.S.C. § 227(e)(8)(A) and (B) ("a call made using a voice service ***or*** a text message sent using a text messaging service." (emphasis added)); § 227(i)(1)(A) and (B) ("a call made ***or*** text message sent; "a call ***or*** text message"(emphases added).

"Adjacent provisions utilizing different terms . . . must connote different meanings." *Jewish Hosp. v. Secretary of Health & Human Servs.,* 19 F.3d 270, 275 (6th Cir. 1994). Congress has not made a similar change to § 227(c)(5). Thus, in one provision of the TCPA, the statute uses the term(s) "call or text message" while another merely uses the term "telephone call." The only permissible conclusion to reach from this difference is that the latter term is intentionally narrower than the former. Simply stated, telephone call as used in § 227(c)(5) does not include text messages.

**B. The FCC's Interpretation of the TCPA Is Not Binding On this Court**

In *Loper Bright*, through which the Supreme Court overturned the *Chevron* deference doctrine, the Court reiterated that it is the traditional function of courts to decide whether the law means what the agency says." *Loper Bright*, 603 U.S. 369, 392 (2024). Thus, notwithstanding the FCC's proclamation in its 2003 rulemaking that the term "call" for TCPA purposes "encompasses both voice calls and text calls," 18 FCC Rcd. 14014 ¶ 165 (2003) (the "2003 Order"), the

---

[1] The TCPA was amended in 2018 to include subsection (e)'s text message language. *See* Pub. L. 115-141.

[2] The TCPA was amended in 2019 to include the text message language in sections (i) and (j). *See* Pub. L. 116-105.

Court need not defer to the interpretation.[3]

In the 2003 Order, the FCC did not cite to any statutory support for its conclusion that the term "call" encompasses a text message. Of course, the reason for that silence is readily apparent – no statutory basis exists for that conclusion. The FCC instead proclaimed that the interpretation was consistent with its understanding of the TCPA's policy goals. 18 FCC Rcd. 14014 ¶ 165.

It is the Court that has the appropriate authority to interpret the TCPA's text, not the FCC. *See Loper Bright* and *McLaughlin Chiropractic*. While *McLaughlin Chiropractic* calls for "appropriate respect" to be afforded to the FCC's interpretation, the Court "can provide appropriate respect to [the] agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text." *Davis v. CVS Pharm, Inc.*, 797 F. Supp. 3d 1270, 1275 (N.D. Fla. 2025).

The FCC's policy-based interpretation cannot rewrite the TCPA's clear text. In fact, because this policy-based interpretation conflicts with the text, the Court should disregard it, exercise its own independent judgment, and appropriately conclude that the unambiguous terms of § 227(c)(5) do not apply to text messages.

[3] To the extent that the Hobbs Act might have otherwise compelled the Court to defer to the FCC's interpretation even after *Loper Bright*, that constraint is gone as well. In *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 168 (2025), the Supreme Court held that in enforcement proceedings, district courts are not "bound by the FCC's interpretation of the TCPA," and that instead they "should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."

### C. 47 C.F.R. § 64.1200(e) Does Not Render 47 U.S.C.§ 227(c)(5) Applicable to Text Messages

47 C.F.R. § 64.1200(e) purports to extend the scope of subsection (c) and (d) of that section to text message calls or text messages. For three distinct reasons, however, this provision does not alter the fact that 47 U.S.C. § 227(c)(5) does not apply to text messages.

First, the provision itself contains language limiting its scope: "to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" The 2003 Order which purported to bring text messages within the definition of "call" did so within the context of § 227(b), not § 227(c). Underscoring this point are that the FCC (1) explicitly mentioned "automatic telephone dialing system," "artificial or prerecorded message," and "automated or prerecorded telephone calls," and (2) cited only to 47 U.S.C. § 227(b) and the implementing regulation of that provision, 47 C.F.R. § 64.1200(a). *See, e.g.*, *Jones v. Blackstone Med. Servs.*, LLC, 792 F. Supp. 3d 894, 900-01 (C.D. Ill. July 21, 2025), *aff'd*, *Steidinger*, 182 F.4th 532 (7th Cir. 2026). And so, by the FCC's own limitation, the provision does not serve as a mechanism to broaden the scope of 47 U.S.C. § 227(c)(5)'s coverage to text messages.

Second, and as explained in further detail below, Congress imposed a deadline by which the FCC was to prescribe rules purporting to "implement methods and procedures for protecting the privacy rights" of residential telephone subscribers. That deadline, set by 47 U.S.C. § 227(c)(2), was not later than September 20, 1992, a date that had long since passed by the time that the FCC had both amended 47 C.F.R.§ 64.1200 to include subsection (e), 68 FR 44144 (2003),

and then later revised the subsection to include the words "text message," 89 FR 5098 (2024). Consequently, the Court must refuse to apply it in a manner that rewrites the text of 47 U.S.C. § 227(c)(5), as the rule is otherwise void and unenforceable by virtue of the FCC's lack of statutory authority to prescribe it. [4]

Third, the FCC, like every other executive agency, has no authority to rewrite the terms of legislation. "Atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 315 (11th Cir. 2025) (citing *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014)) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."); *UMG Recordings v. Grande Comm. Networks*, 118 F.4th 697, 723 (5th Cir. 2024) ("between policy arguments and the statutory text . . . the text [of the Act] must prevail."); *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (observing that an agency's opinion that its rule is "good policy" "does not change the statute's text")).

The text of 47 U.S.C. § 227(c)(5) is clear that the private right of action is available to recipients of two or more telephone call, not to recipients of text messages. *Steidinger*, 182 F.4th at 540. The FCC has no authority to dictate otherwise. *Ins. Mkt. Coal. Ltd.*, 127 F.4th at 315. The Court must reject any enforcement of 47 C.F.R. § 64.1200(e)'s amendment to the TCPA's text.

## II. THERE IS NO PRIVATE RIGHT OF ACTION FOR ALLEGED VIOLATIONS OF 47 C.F.R. § 64.1200(c)

Unlike 47 U.S.C. § 227(b), which (i) broadly applies to any call

[4] As MPros explains in detail below, the expiration of this statutory deadline served to terminate all rulemaking authority conferred on the FCC to prescribe regulations under § 227(c).

placed with either automated or prerecorded or artificial message technology; (ii) provides a private of action to <u>any</u> recipient of such a call placed without his/her prior express consent, and (iii) confers <u>perpetual</u> rulemaking authority upon the FCC to prescribe regulations to implement the subsection, 47 U.S.C. § 227(c) is far more limited in scope. It's many limitations include that it (i) applies only to one particular kind of call (telephone solicitations) rather than to any call; (ii) provides a private right of action only to those recipients of two or more telephone calls placed in violation of regulations prescribed pursuant to the subsection; and (iii) and confers rulemaking authority upon the FCC that (a) expressly imposes a deadline by which such regulations must be prescribed and (b) explicitly includes minimum substantive requirements mandated of certain such regulations prescribed pursuant to that grant of authority, including regulations concerning establishment and operation of a national database of telephone numbers of residential subscribers who object to receiving telephone solicitations.

The difference in breadth and scope between § 227(b) and § 227(c) is unsurprising. When Congress enacted the TCPA, it considered automated telephone calls to be a far greater concern than live solicitations. *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *11 (D. Or. July 21, 2025) ("Congress found that automated prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls") (internal citation omitted). The limiting language throughout § 227(c) speaks to this difference in concern. Applying those limitations, the Middle District of Florida recently granted dismissal finding that there is no private right of action under 47 U.S.C. § 227(c)(5) for purported violations of 47 C.F.R.

§ 64.1200(c). *See Internicola v. MortgagePros, LLC*, 2026 WL 3027393, at *9-10 (M.D. Fla. Sept. 24, 2026). This Court should do the same.

### A. <u>§ 227(c) Expressly Limits the Scope of the FCC's Rulemaking Authority</u>

In two separate provisions, Congress unequivocally limited the FCC's rulemaking authority under 47 U.S.C. § 227(c) in a manner that imposed a deadline by which the FCC was to prescribe regulations pursuant to § 227(c).

<u>First</u>, 47 U.S.C. § 227(c)(1) provides that "[w]ithin 120 days after enactment of this section [enacted Dec. 20, 1991], the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."

<u>Second</u>, 47 U.S.C. § 227(c)(2) then goes on to provide that "[n]ot later than 9 months after the date of enactment of this section [enacted Dec. 20, 1991], the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph . . . ."

Through these two sections, Congress imposed two deadlines upon the FCC: first, a rulemaking proceeding was to be initiated no later than April 18, 1992; and second, that rulemaking proceeding was to be concluded and regulations to implement methods and procedures for protecting the privacy rights described in 47 U.S.C. § 227(c)(1) were to be prescribed no later than September 20, 1992.

The FCC complied with these mandates by first initiating a Notice of Proposed Rulemaking on April 17, 1992, in which it proposed and sought comment on certain TCPA-related regulations, 7 FCC Rcd 2736 (1992), and thereafter, adopting rules to implement the TCPA on

September 17, 1992. Those rules were subsequently released on October 16, 1992 and thereafter published in the federal register on October 23, 1992. *See* FCC 92-443 and CC Docket No. 92-90.

47 U.S.C. § 227(c)(1)(D) contemplates supplemental rulemaking authority, but conditions it upon a proposal from the FCC to Congress for specific additional restrictions of telephone solicitations. The FCC, in its 1992 rulemaking proceeding, considered whether additional authority was needed, and noted that it would decline to seek such authority. *See* 7 FCC Rcd 8752, 8781 ("Based upon our actions here, we find that no further authority is required at the present time to accomplish the goals of the TCPA to restrict unwanted telephone solicitations. The regulations implemented satisfy the TCPA's requirements that residential subscribers be provided with a means to avoid unwanted telephone solicitations . . .")

Thus, the rules adopted in 1992 comprise the universe of rules permissibly prescribed within the statutory authority conferred on the FCC. Any other rules purporting to implement § 227(c) but which were (i) prescribed pursuant to a rulemaking proceeding which was initiated later than April 18, 1992 and/or (ii) promulgated later than September 20, 1992, were enacted by the FCC in excess of authority granted to it by § 227(c). *See Internicola*, 2026 U.S. Dist. LEXIS 218718, at *9.

The TCPA's other operative subsections demonstrate that Congress deliberately imposed the deadline set for § 227(c). Contrast the open-ended grants of rulemaking authority of §§ 227(b)(2), (d)(2)-(3) with the deadlines Congress set in §§ 227(c)(2), (i)(1) and (j)(1). *Compare, e.g.,* § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."), §

227(d)(2) ("The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require . . .") *with* § 227(i)(1) ("Not later than 18 months after the date of the enactment of this subsection [enacted Dec. 30, 2019], the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to . . .").

### B. The FCC's NDNC-related regulations were prescribed pursuant to 15 U.S.C. § 6153

Congress provided the FCC with discretion over the decision of whether or not to establish the NDNC, as per § 227(c)(3). Through its 1992 rulemaking, the FCC exercised that discretion, opting not to establish a database within the time permitted by Congress to do so. It described the basis for that decision as follows: "[i]n declining to adopt a national do-not-call list in 1992, the Commission concluded that a national database would be costly and difficult to establish and maintain in a reasonably accurate form. The Commission found that frequent updates would be required, regional telemarketers would be forced to purchase a national database, costs might be passed on to consumers, and the information compiled would present problems in protecting consumer privacy." 67 FR 62667, *62676 ¶ 41 (2002).

In response to the FCC's exercise of its discretion not to establish a national do-not-call list, Congress took independent steps which ultimately culminated in the NDNC's creation. These steps demonstrate that the FCC's authority to promulgate NDNC-related regulations arose not from the TCPA but from a separate statute.

First, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. § 6101 et seq.) (the "Telemarketing Act"). The Telemarketing Act, among other things,

directed the Federal Trade Commission ("FTC") to issue a rule prohibiting both deceptive and abusive telemarketing acts or practices. *See* 15 U.S.C. § 6102(a). That rule became known as the Telemarketing Sales Rule, 16 C.F.R. § 310.1 *et seq.* ("TSR").

In compliance with a 5-year review of the TSR mandated by 15 U.S.C. § 6108, the FTC published a notice indicating that it would conduct a forum examining issues related to the TSR's do-not-call provision at § 310.4(b)(1)(ii). *See* 64 FR 66124 (Nov. 24, 1999).

Following that review, the FTC published a Notice of Proposed Rulemaking on January 30, 2002 proposing revisions to the TSR, among which included the creation of a national do-not-call registry. *See* 67 FR 4492 (2002). This rulemaking was permissible because, in contrast to the time-limited grant of rulemaking authority Congress delegated in 47 U.S.C. § 227(c), the Telemarketing Act confers perpetual rulemaking authority on the FTC. 15 U.S.C. § 6102(a)(1) ("The Commission shall prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."). The subsequent Final Rule formally establishing the NDNC was published on January 29, 2003. *See* 68 FR 4580 (2003).

Against a backdrop of uncertainty as to the FTC's legal authority to establish a national do-not-call registry (*see U.S. Sec. v. F.T.C.*, 282 F.Supp.2d 1285, 1291 (W.D. Okla. 2003)), Congress took its <u>second step</u> by enacting the Do Not Call Implementation Act (the "DNC Act"). *See* Public Law 108-10; 15 U.S.C. § 6151 *et seq*. And to settle that uncertainty, the DNC Act first expressly states at 15 U.S.C. § 6151(a) that the FTC has the authority to implement and enforce a national do-not-call registry pursuant to the Telemarketing Act; and thereafter expressly states at 15 U.S.C. § 6151(b) that the

provision of the TSR which had been amended to establish the NDNC (16 C.F.R. § 310.4(b)(1)(iii)) was formally ratified.

In recognition that the FTC's jurisdiction over telemarketing is limited in scope though, and does not extend to common carriers and certain other entities and calls, the DNC Act expressly mandates regulations from the FCC so that if one of those entities not covered by the TSR's NDNC rule were to make an offending call, a prospective violation would not otherwise fall through the cracks. Thus, 15 U.S.C. § 6153 confers on the FCC explicit rulemaking authority. While similar to 47 U.S.C.§ 227(c) as far as providing a deadline by which the FCC was to promulgate rules contemplated by Congress, 15 U.S.C. § 6153 differs from § 227(c) insofar as it authorized mandatory, rather than discretionary, actions from the FCC - specifically providing that "the Federal Communications Commission shall issue a final rule."

In order to ensure that the FCC could meet § 6153's deadline to prescribe the rules mandated by the statute, Congress identified an ongoing rulemaking proceeding that the FCC had initiated prior to the DNC Act's enactment, and directed that it be the vehicle through which the FCC prescribed the mandatory NDNC-related regulations. Similarly, Congress recognized both that the deadline by which the FCC could prescribe NDNC-related regulations in compliance with §227(c)(3) and (4) had lapsed, and that with the lapse, the FCC's statutory authority to promulgate rules effectuating the goals of those provisions had expired. Therefore, Congress in the DNC Act statutorily provided solutions to the NDNC-related cost considerations that the FCC had previously been tasked with in §§ 227(c)(3) and (4) but had exercised discretion not to regulate within the enumerated timeline, including the setting of a fee schedule.

*See* 15 U.S.C. § 6154.

Notably, whereas 15 U.S.C. § 6151 explicitly cited the independent statutory authority pursuant to which Congress sanctioned FTC's NDNC-related rulemaking, 15 U.S.C. § 6153's grant of rulemaking authority to the FCC does not reference § 227(c) as the statutory basis pursuant to which the FCC's NDNC-related regulations would arise. In fact, § 6153's only reference to the TCPA is as a descriptor of the rulemaking proceeding that the FCC had initiated prior to the DNC Act's enactment and through which the FCC was to prescribe the regulations mandated by the DNC Act. Thus, the FCC prescribed the NDNC-related regulations contained in 47 C.F.R. § 64.1200 not pursuant to any rulemaking authority conferred by 47 U.S.C. § 227(c), but rather, pursuant to the rulemaking authority conferred on it by 15 U.S.C. § 6153.

Nevertheless, the DNC Act does not provide for an independent private right of action. It simply (i) ratifies the FTC's establishment of the NDNC and prohibits expiration of a subscriber's registration of his/her telephone number on the registry, (ii) implements a funding mechanism and corresponding fee schedule, (iii) imposes reporting requirements on the FTC and FCC, and (iv) directs the FCC to prescribe regulations that maximize consistency with the FTC's NDNC-regulations to ensure that compliance obligations flow to entities which telemarket but are otherwise not subject to the limited FTC telemarketing jurisdiction.

Consequently, no private right of action exists for alleged violation of 47 C.F.R. § 64.1200(c), and Plaintiff's claims purporting to arise from alleged violations of that regulation must be dismissed as a result.

## III. § 227(c) DOES NOT APPLY TO WIRELESS SUBSCRIBERS

Through Section 227(c), Congress conferred on the FCC rulemaking authority for purposes of protecting the privacy rights of "residential telephone subscribers." By extending the protections afforded by the regulations purportedly prescribed pursuant § 227(c) to wireless subscribers, the FCC exceeded the scope of its authority and rewrote the statute's language in the process.

In the 2003 Order, the FCC redefined the term "residential telephone subscriber" to presumptively include "wireless subscribers." 18 FCC Rcd. 14014, at 14039 ("[W]e will presume wireless subscribers who ask to be put on the national d-not-call list to be residential subscribers.").[5] However, in doing so, the FCC articulated a flawed rationale in support of its purported authority to rewrite the statute. Its stated rationale was that "a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations." *Id.* at 14034. Nevertheless, the congressional rulemaking authority conferred through § 227(c) not only is limited to the implementation of "methods and procedures" (of which a redefinition or reclassification of residential telephone subscriber is neither), but the grant of authority speaks nothing of residential consumers; it speaks of residential subscribers.

The term "residential telephone subscriber" by its plain

---

[5] MPros expressly incorporates by reference the arguments set forth in Section II, A, *supra*, as set forth herein. The deadline imposed by Congress in § 227(c)(1)-(2) applies with equal force to any regulation, purportedly prescribed by the FCC under § 227(c), which was promulgated after that deadline had lapsed, inclusive of the provisions of the 2003 which redefined "residential telephone subscriber" to include "wireless subscribers."

meaning, however, does not apply to cellular subscribers. Because the TCPA does not define "residential telephone subscriber," the statutory interpretation analysis is the same as that which applied to "telephone call" – i.e., the term must be given its ordinary meaning at the time the text was adopted. "[I]n 1991, dictionaries defined "residential" as 1) "of or connected with residence," 2) "of, characterized by, or suitable for, residences or homes," and 3) "chiefly for residents rather than transients." And "residence" was defined as a "dwelling, place, or adobe, especially a 'house.' Important too, a mainstream definition of "subscriber" at the time of enactment was "an individual having commercial telephone equipment installed on his premises." *Anthony v. Brian Mktg. Grp.*, 2026 WL 2685650, at *16-17 (S.D. Fla. Sept. 11, 2026) (internal Webster and Black's Law Dictionary citations omitted); *see also Lowrey v. Twilio, Inc.,* 2026 WL 2958730 (W.D.Va. Oct. 1, 2026) *and Koeller v. OX Appsec Sec., Inc.,* 2026 WL 2935851 (E.D.MO. Sept. 30, 2026).

The TCPA itself also distinguishes between "cellular" and "residential." By way of example, § 227(b)(1)(A)(ii) prohibits use of autodialers to make calls to a cellular telephone service, while § 227(b)(1)(A)(iii) and § 227(b)(1)(B) prohibit using that technology to initiate calls to residential telephone lines. *See also, Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 613 (describing § 227(b) as "prohibit[ing] robocalls to cell phones and home phones"); *Turizo v. Subway Franchisee Adver. Fund. Tr. Ltd.*, 603 F.Supp. 3d 1334, 1334 (S.D. Fla. 2022) (comparing provisions of § 227(b) and concluding that "[t]he TCPA clearly draws a distinction between cellular telephones and residential telephones."). Congress would have had no need to distinguish "cellular" and "residential" if it believed the

terms to be synonymous. In fact, reading them as synonyms would render the distinction surplusage. Where Congress knew how to draw the distinction between residential and cellular in one portion of the statute, its decision not to in another portion of the statute must be given meaning. And the FCC's action to disregard that decision was an improper exercise of authority.

While the FCC may have believed that it was good policy to allow wireless subscribers to be deemed "residential telephone subscribers" for purposes of § 227(c), "[a]textual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 315. It had no authority to rewrite the TCPA. Because Plaintiff is a wireless telephone subscriber and not a residential telephone subscriber, she lacks the statutory standing to assert claims under § 227(c) for the telephone calls and/or text messages at issue.

## IV. PLAINTIFF'S WASHINGTON STATE LAW CLAIMS MUST BE DISMISSED

Plaintiff's Washington State law claims must also be dismissed. First, the Court should decline to exercise supplemental jurisdiction over them. Otherwise, Count IV fails because CEMA affords no damages remedy absent allegations of phishing and the FAC alleges no injury to business or property as required to sustain a CPA claim; and Count III fails because Plaintiff was not aggrieved by "repeated violations" of 80.36.390.

### A. The Court Should Decline to Exercise Supplemental Jurisdiction

Upon the appropriate dismissal of the TCPA claims, the Court should decline to exercise supplemental jurisdiction over Counts III and IV. 28 U.S.C. § 1367(c)(3). As the Sixth Circuit has recognized, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law

claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

**B. <u>CEMA Provides No Damages Remedy</u>**

Count IV is a CPA claim predicated on violation of Washington's Commercial Electronic Mail Act, codified at RCW 19.190.005 *et seq.* enumerates the private right of action at RCW 19.190.090(1) and provides a damages action limited to phishing. The Washington Supreme Court has read the statute in accordance with its plain language and unambiguously held that one who receives a text message that violates CEMA, but that does not involve phishing, has no private right of action. *See Wright v. Lyft, Inc.*, 189 Wn.2d 718, 723 (2017) ("We conclude that the plain language of chapter 19.190 RCW creates a private cause of action with damages only for phishing violations. RCW 19.190.080, 090.").

"Phishing" generally refers to Internet activity using fraudulent e-mails and websites to induce someone to reveal personally identifying information under false pretenses. *Id.* at 725. However, Plaintiff not only does not plead facts to support a phishing violation, but the images of the subject text messages demonstrate that they were not phishing.

**C. <u>Plaintiff Fails to Plead A CPA Injury</u>**

To establish a CPA claim, a plaintiff must establish: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business or property, and (5) causation. *See Wright*, 189 Wn.2d at 728 (citing H*angman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986)). And while a CEMA violation is a *per se* CPA violation, it does not necessarily follow that a CEMA violation

entitles a plaintiff to recover under the CPA. This is because "[a] successful CEMA claim establishes only the first three elements" of a CPA claim. *Meade v. Profusion Cosmetics Corp.*, 2026 WL 2098093, at *5 (D. Wash. July 16, 2026). "CPA still requires the plaintiff to show the defendant caused injury to their business or property. [A] CPA claim, dependent entirely on CEMA, is not cognizable" *Id.*

Plaintiff's original complaint was completely bereft of any allegation concerning a purported injury to her business or property. Among the amendments to that pleading was an allegation intended to address that deficiency. Alas, the amendment is not a sufficient cure, and the CPA claim remains lacking for the same reason. It must be dismissed accordingly.

The Washington Supreme Court has made clear that the requirement for an injury to business or property is satisfied only by an economic loss. *Montes v. SPARC Grp. LLC*, 6 Wn.3d 321, 324 (2026). Here, the FAC's only allegation of injury to business or property is that "Plaintiff . . . was injured in [her] property because Defendant's unlawful commercial text messages occupied and interfered with the use of [her] cellular telephone[], consumed the telephones' memory and battery, and temporarily deprived [her] of the undisturbed use of [her] telephones and telephone service." FAC ¶ 95. Earlier in the pleading, Plaintiff indicated her harm as a violation of her privacy and being "annoyed and harassed." FAC at ¶ 55. These are descriptions of inconvenience, not economic loss.

Privacy, annoyance, and harassment are archetypal personal, noneconomic harms. They are the "mental distress, embarrassment, and inconvenience" that Washington law excludes from the CPA. *See Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 431 (2014).

Moreover, allegation that a phone was "occupied" or that Plaintiff was "temporarily deprived . . . of the undisturbed use" of it for the moment it took three messages to arrive is not an allegation of lost money or property. Plaintiff does not allege, for example, that she paid anything for the messages, that they counted against a limited text or data allowance plan, that she incurred any charge from her carrier for their receipt, that any data or property was lost, or that her phone was worth less as a result of receipt of the messages.

Finally, the bare assertion that the subject text messages "consumed" some unspecified quantity of "memory and battery" is precisely the kind of label that both *Twombly* and *Iqbal* reject. The FAC does not allege that the drain on the battery or use of storage was measurable, that it required Plaintiff to spend any money, or that it impaired the phone's value or its ability to function. A momentary, unquantified draw on a phone's battery or memory is not an "objective economic loss." *Montes,* 6 Wn.3d at 338.

Instances in which the Washington Supreme Court recognized temporary loss as an objective economic loss have included the temporary wrongful loss of title to property, *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 854 (1990), and loss of business goodwill. *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 740 (1987). The FAC's allegations bear no resemblance to these. To the contrary, they describe nothing more than the experience of receiving an unwanted message. Because those allegations do not include an economic loss, the CPA claim fails as a matter of law.

### D. Plaintiff Does Not Allege Repeated Violations of RCW § 80.36.390

RCW § 80.36.390(13) provides that "[a] person aggrieved by

repeated violations of this section may bring a civil action in superior court to enjoin future violations, to recover damages, or both." Plaintiff relies on two sets of communications to meet that threshold: three text messages received on the morning of June 23, 2026, which she alleges violated both the calling-hours restrictions of subsection (8) and the do-not-call restrictions of subsection (9), and seven voice calls, which she alleges violated subsection (9). Neither gets her there, however. The FAC pleads no facts about the voice calls from which the Court can infer that MPros placed them or that they were telephone solicitations. And the text messages amount to, at most, a single episode lasting four minutes.

**i. <u>The FAC Pleads Nothing About the Voice Calls</u>**

The FAC's only factual allegation about the voice calls is that MPros "called Plaintiff seven times from June 23, 2026 to July 7, 2026." FAC ¶ 45. In contrast with the text messages, in which Plaintiff pled the sending number, sender name, and time of each message, for the calls she has pled no number, no caller ID, no date or time for any specific call, no voicemail, and not a word that any caller said. Even the timing of the calls is inconsistent, as the FAC alleges that MPros "continued contacting Plaintiff by placing additional voice calls" after she told it that it had reached the wrong person, but the image she includes indicates she told MPros that on June 25 while she alleges an unspecified number of calls occurred as early as June 23.

The FAC's silence as to facts concerning these calls defeats two elements of a subsection (9) claim. First, subsection (9) reaches only a person who "initiate[s], or cause[s] to be initiated," a prohibited telephone solicitation. RCW 80.36.390(9). A plaintiff must

therefore "allege sufficient factual content to plausibly claim" that the defendant is responsible for the calls. *Dobronski v. Baid*, 2024 WL 3997059, at 5-6 (E.D. Mich. Aug. 29, 2024). In *Baid,* the plaintiff satisfied that standard by alleging that the callers identified themselves as representing the defendant, that the calling number tied the calls to the defendant, and that the defendant attempted to charge his credit card. The FAC alleges nothing comparable. It only alleges a link between MPros and the calls "upon information and belief" that the calls "were part of the same telemarketing campaign" as the messages. FAC ¶ 46.

Second, a call violates subsection (9) only if it is a "telephone solicitation," meaning a call made "for the purpose of encouraging the person to purchase property, goods, or services." RCW 80.36.390(1)(a). Having alleged nothing about what was said on any call, Plaintiff attempts to satisfy this burden by asserting that the calls "immediately followed" the text messages and that a solicitation is "[t]he only reasonable inference." FAC ¶¶ 47-48. Labeling an inference as the only reasonable one does not provide any of the facts needed to draw that inference, however. *See Twombly*, 550 U.S. at 555.

**ii. <u>The Text Messages Are, at Most, a Single Episode</u>**

The text messages do not provide a repeated violation either. The FAC identifies three messages at paragraph 38 through a screenshot. Only two of them could qualify as a telephone solicitation. The first message was received at 6:50 a.m., and the second and third at 6:54 a.m. FAC ¶ 38. The third message, received at the same moment as the second, is an image that accompanied the second. *Id.* ¶¶ 38, 41. Nothing in that image encourages the purchase

of property, goods, or services, so it is not a telephone solicitation under RCW 80.36.390(1)(a).

That leaves two messages, received four minutes apart, in a single exchange addressed to someone named "Joanne." FAC ¶¶ 38-39, 41. Two messages in a four-minute span are a single continuous event, not violations repeated over weeks, days, or even hours. Had the Legislature intended for any two violations to suffice, it could have said so. It instead required "repeated violations." RCW § 80.36.390(13)

Even if "repeated" could be satisfied by a low count such as two, repetition implies recurrence over time, even recurrence which itself has recurred. Reading "repeated" in the statute to mean nothing more than "more than one" would disregard the Legislature's choice of language. Because Plaintiff does not plausibly allege repeated violations, Count III must be dismissed as a result.

## V. CONCLUSION

For the foregoing reasons, MPros respectfully requests that the Court grant this motion, dismiss the FAC, and grant MPros such further and additional relief as the Court deems just and proper.

Dated: October 21, 2026

**KLEIN MOYNIHAN TURCO LLP**

By: *<u>/s/Neil E. Asnen</u>*
Neil E. Asnen
450 Seventh Avenue – 40th Floor
New York, NY 10123
nasnen@kleinmoynihan.com

-and-

Chrisdon F. Rossi (License #: P59305)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
32605 W. Twelve Mile Road, Suite 300
Farmington Hills, MI 48334
Tel: (248) 783-6780 x4813
chrisdon.rossi@qpwblaw.com

*Attorneys for MortgagePros LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 21, 2026, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

*/s/Neil E. Asnen*
Neil E. Asnen